LAWLOR et al. v. LOEWE et al.

(Circuit Court of Appeals, Second Circuit, April 10, 1911. Petition for Rehearing, May 8, 1911.)

No. 123.

1. MONOPOLIES (§ 12*)—COMBINATION IN RESTRAINT OF INTERSTATE COMMERCE —BOYCOTT.

If it be shown that individuals have combined together to induce a manufacturer engaged in interstate commerce to conduct his business as they wish, and upon his refusal further combine not only to prevent him from manufacturing articles intended for interstate commerce, but also to prevent his vendees in other states from reselling the articles which ·they had imported from the state of manufacture, or from further negotiating for the purchase and intertransportation of such articles, the combiners intending thereby to destroy or obstruct an existing interstate traffic, such combination of individuals must be held to have essentially obstructed the free flow of commerce between the states, and is in violation of Anti-Trust Act of July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), and when such obstruction is shown to have brought about an injury to a person's business, damages may be recovered, although the impelling motive of the combination was an effort to better the condition of the combiners, which, except for the anti-trust act, might be proper and lawful.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 12.*]

2. TRADE UNIONS (§ 4*)—AGENTS OF LABOR ORGANIZATION—LIABILITY OF MEMBERS FOR UNLAWFUL ACTS.

A clause in the constitution of a labor organization which provides that certain of its officers "shall use all the means in their power" to bring nonunion shops into the trade, does not necessarily imply that these officers shall use other than lawful means, and the fact alone that a member contributes money to the support of the organization does not make him responsible as a principal for unlawful acts of the officers or their agents, but in order that his contributions shall have such effect something more must be shown, as that unlawful means had been so frequently used with the express or tacit approval of the association that its agents were warranted in assuming that they might use such means, and that the associa-

tion and its individual members would approve or tolerate such use, whenever the end sought to be attained might be best attained thereby.

[Ed. Note.—For other cases, see Trade Unions, Dec. Dig. § 4.*]

3. MONOPOLIES (§ 28*)—ACTION FOR DAMAGES AGAINST COMBINATION IN RESTRAINT OF INTERSTATE COMMERCE—QUESTIONS FOR JURY.

In an action to charge defendants, as members of various local unions of a labor organization, with liability for acts of agents of the organization on the ground of a combination in restraint of interstate commerce in violation of Anti-Trust Act of July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), where there was conflicting testimony as to their knowledge of such acts and other evidence from which inferences must be drawn, the question of liability was for the jury, and it was error to withdraw such question from them and to submit only the question of damages.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 28.*]

4. TRADE UNIONS (§ 9*)—ACTION TO CHARGE PRINCIPAL FOR ACTS OF AGENT—EVIDENCE.

In an action to charge members of a labor organization individually with liability because of alleged unlawful acts of agents sent out by the organization, evidence that defendants paid dues to the organization after service of the complaint is not competent either as showing ratification by defendants of the acts of such agents or that such acts were authorized when committed.

[Ed. Note.—For other cases, see Trade Unions, Dec. Dig. § 9.*]

5. EVIDENCE (§ 317*)—HEARSAY.

In an action by a manufacturer doing an interstate business against members of a labor organization to charge them with liability under Anti-Trust Act of July 2, 1890, c. 647, § 7, 26 Stat. 210 (U. S. Comp. St. 1901, p. 3202), one of the violations of the act charged being that defendants combined to prevent customers of plaintiff in other states from buying his goods by means of threats or boycott, etc., testimony of plaintiff's salesmen that customers told them of such threats, made by persons claiming to represent defendant organization, was incompetent as hearsay.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1174–1200; Dec. Dig. § 317.*]

In Error to the Circuit Court of the United States for the District of Connecticut.

Action at law by D. E. Loewe and others against Martin Lawlor and others. Judgment for plaintiffs, and defendants bring error. Reversed.

This cause, an action for damages under the anti-trust act, comes here upon writ of error to review a judgment of the Circuit Court, District of Connecticut, for $232,240.12 in favor of defendants in error, who were plaintiffs below. The verdict on which this judgment was entered was practically directed by the court, who left to the jury merely the matter of damages, as the "only question with which they could properly concern themselves." The jury assessed the damages at $74,000, which amount the court trebled.

Alton B. Parker, F. L. Mulholland, and John K. Beach, for plaintiffs in error.

Walter G. Merritt and Daniel Davenport, for defendants in error.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

LACOMBE, Circuit Judge. [1] The complaint is printed in full, and the cause of action thoroughly discussed in Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, where the demurrer to the complaint was disposed of. Reference to that opinion sufficiently indicates the issues involved on the trial. The decision also has fixed the law of this case. It is needless to inquire whether boycotts generally, or this particular variety of boycott, are or are not unlawful at common law, or under the statutes of some particular state. If it be shown that individuals have combined together to induce a manufacturer engaged in interstate commerce to conduct his business as they wish, and, upon his refusal, further combine not only to prevent him from manufacturing articles intended for interstate commerce, but also to prevent his vendees in other states from reselling the articles which they had imported from the state of manufacture or from further negotiating for the purchase and intertransportation of such articles, the combiners intending thereby to destroy or obstruct an existing interstate traffic, such combination of individuals must be held to have essentially obstructed the free flow of commerce between the states. A combination to effect such an obstruction is a violation of the anti-trust act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]); and when such obstruction is shown to have brought about an injury to a person's business, recovery may be had, although the impelling motive of the combination was an effort to better the condition of the combiners, which except for the anti-trust act might be proper and lawful.

Of the facts, conceded by demurrer, which were relied upon in the former decision, the following are fully proved by competent evidence in the record now before us: Plaintiffs were manufacturers of hats in Danbury, Conn., and had an interstate trade with customers in different states, which was very much the larger percentage of their business. The combination of individuals known as the United Hatters of North America, numbering several thousand members, were combined with other labor unions into another association known as the American Federation of Labor, numbering more than a million members, scattered all over the United States. The United Hatters undertook to unionize the different factories in which their members worked. In some instances the owners thereof as first refused to unionize their factories. Thereupon the United Hatters declared a union war against them and missionaries purporting to represent the combination visited customers of such recalcitrant owners in different states, and told them that unless they ceased to handle such goods, the affiliated unions would refrain from patronizing them. As a result thereof some of those who had at first refused yielded and unionized their factories. Plaintiffs were interviewed by some officers and members of a hatters' union, and after some discussion as to the advantages and disadvantages of unionizing their factory refused to do so. Thereupon a strike was called which took all union men out of plaintiffs' factory. Subsequently missionaries representing themselves as coming on behalf of the United Hatters visited customers of plaintiffs in other states. To some of these customers they stated that

unless they would cancel any orders they had given for plaintiffs' goods, and would agree to discontinue buying from plaintiffs in the future, their (the customers') "factories would be tied up and the men called out." To others they stated that if they continued business with plaintiffs they (the missionaries) would "call on their own customers and endeavor to prevent their using their goods"; i. e., the goods offered for sale by the person interviewed. To others they stated that unless they ceased to deal in plaintiffs' goods they "would be boycotted," or "would be put on the unfair list." Some of the customers of plaintiffs who were thus interviewed ceased to make further purchases of Loewe hats because of statements made to them at these interviews.

The first assignment of error, which challenges attention on this appeal and which is discussed at the outset of defendants' brief, is the action of the trial judge in taking the case from the jury and himself deciding every question except the amount of damages. Defendants contend that in so doing "the trial court assumed the function of a jury in passing upon the credibility of witnesses and weighing conflicting testimony." We think this assignment of error is well taken for these reasons: The defendants are all members of a voluntary association or trade union of journeymen hatters, known as the United Hatters of North America, including more than 9,000 journeymen hatters residing in different states of the United States or in Canada. Defendants are members of various local unions of this association in the state of Connecticut, and each of them has paid dues continuously to his local union for some years prior to September, 1903, the date this suit was commenced. These dues were both local and national—a certain percentage of the member's wages for each purpose. Both had to be paid; as the secretary of the Danbury local expressed it, "we wouldn't accept one if he didn't pay the other." This money has been, in part at least, disbursed in paying the various officers of the local and of the general unions and in paying the various agents or missionaries who have been engaged in carrying out the objects of the association, which included the extension of the union, the increasing of a demand for goods bearing the union label and the so-called unionizing of factories. These objects of course could be promoted by methods entirely lawful and proper, or by methods which were unlawful and improper, or which were of such a character as to constitute a combination in restraint of interstate trade within the meaning of the anti-trust act. In 1896 the United Hatters of North America affiliated with the American Federation of Labor, its officers on its behalf pledging its members individually and collectively to be governed by the constitution, rules and usages of the federation. Since then delegates to the conventions of the federation have been elected by a referendum vote of the United Hatters pursuant to the Hatters' constitution, and also a delegate from the Connecticut State Federation with which all the local unions to which defendants belong were affiliated. Many of the defendants and of other members of the United Hatters have supported the activities

of the United Hatters and contributed to the support of the American Federation of Labor.

[2] It has been argued here that the mere fact that any individual defendant was a member of and contributed money to the treasury of the United Hatters' Association made him the principal of any and all agents who might be employed by its officers in carrying out the objects of the association, and responsible as principal if such agents used illegal methods or caused illegal methods to be used in undertaking to carry out those objects. We cannot assent to this proposition. The clause of the constitution of the United Hatters which provides that certain of its officers "shall use all the means in their power to bring such shops (i. e., nonunion shops) into the trade" does not necessarily imply that these officers shall use other than lawful means to accomplish such object. Surely the fact that an individual joins an association having such a clause in its constitution cannot be taken as expressing assent by him to the perpetration of arson or murder. Something more must be shown, ·as, for instance, that with the knowledge of the members unlawful means had been so frequently used with the express or tacit approval of the association, that its agents were warranted in assuming that they might use such unlawful means in the future, that the association and its individual members would approve or tolerate such use whenever the end sought to be obtained might be best obtained thereby.

[3] Plaintiffs, however, did not rest their case on this bald proposition of membership and payment of dues. There is a mass of testimony in the case covering a history of the activities of the United Hatters and of the American Federation and of their various officers, agents, and missionaries for a series of years, tending to show what methods had been employed, what the various organizations thought of such methods, and what it might be expected by any man of the most ordinary intelligence would be done whenever officers and missionaries undertook to unionize any particular factory. Literature, published by the associations and laid before their members in issues sufficient to enable every one to familiarize himself with what was going on, was put in evidence. On the other hand, most of the defendants—175 of them—testified, either on the stand or under stipulation between counsel, that they had never held office in any local or national union and were never delegates to any convention; that they had no information of any trouble in the Loewe factory until after the men were called; that they were not regular readers of the Hatter's Journal, and did not remember reading anything therein about the factories that were unionized before the Loewe campaign opened; that they had no knowledge of the methods which were employed to constrain manufacturers to unionize their shops. With this evidence in there was a conflict of testimony as to a vital issue in the case. The other testimony was of such a character and there was such a mass of it—minutes, resolutions, reports, proclamations, printed discussions, etc.—that the jury might have discredited defendants' protestations of ignorance, but, since they had made such protestations

under oath, they were entitled to have the question of their credibility determined, not by the court, but by the jury.

Some of the defendants were officers of local unions; some of them did not testify, but in the various chains of proof which were relied upon to establish the relation of principal and agent between local unions in Connecticut and individuals, not members of these local unions, who announced themselves as missionaries of union hatters in distant states, there are some links which are proved not directly but as inferences from established facts. Different inferences were at least possible, and in a case of this sort, where conspiracy to do an unlawful act is charged, it should be left to the jury to say which inference shall be drawn. Moreover, it was for the jury to determine from the entire body of proof what was the intent of the individuals who made up the combination or what they must have known were the necessary and inevitable consequences of their acts.

[4] Since there is to be a new trial it is desirable that the opinion of this court should be expressed on two questions as to the admissibility of evidence, which will probably arise again. The court admitted evidence of the payment of their dues to the unions by defendants, after complaint was served. This was not competent as showing ratification, and, as we understand their brief, plaintiffs do not so contend. It was offered as "tending to show that the acts (of the missionaries) were authorized at the time they were performed previous to the suit," upon the theory that otherwise the disclosures made to an individual defendant by his reading of the complaint would have brought forth protest and disapproval on his part. We think it should have been excluded.

[5] A salesman of plaintiffs testified that he called at various times on several different customers, giving their names. In some instances he was allowed to state that the customer told him that at some prior time he had been interviewed by some labor representative who told him that unless he ceased to handle plaintiffs' goods he would get into trouble with the union. This was hearsay, the narrative of a past transaction given by an outside party, not under oath. It was not competent to prove that threats had been made by some one purporting to represent defendants. Its admission is sought to be sustained upon the authority of cases, which hold that it is proper to show as part of the res gestæ what reason was given by a person as an excuse for discontinuing some former practice. Wigmore on Evidence, § 1729, and cases cited. This exception to the general rule should not be extended as far as it was in some of the instances testified to.

The judgment is reversed.

## Petition for Rehearing.

While we fully appreciate the inconvenience which will result from proceeding with a new trial of the cause before the rulings of this court as to the law of the case shall have been reviewed by the Supreme Court, we are not disposed to reverse those rulings and decide this appeal contrary to our convictions in order to facilitate the pres-

entation of the questions arising upon the appeal to the court of last resort. Nor does there seem to be any way to accomplish a like result by ordering a re-argument and undertaking to certify specific questions; the record is too voluminous and the questions would be too numerous, and upon those questions we are not divided in opinion.

There is nothing in the petition to induce a change in the opinion already expressed by this court; all that there is in the petition may be found in the original argument. Counsel seems to have misapprehended what is said in the opinion about knowledge by defendants of the acts done. It has not been decided that it is essential for plaintiffs to prove that any defendant had knowledge of all or any of the specific acts done in the campaign against D. Loewe & Co. On the contrary, it is expressly pointed out that the language of the constitution of the association might be supplemented by proof that, in carrying out its objects, "unlawful means had been so frequently used with the express or tacit approval of the association that its agents were warranted in assuming that they might use such unlawful means in the future, that the association and its individual members would approve or tolerate such use whenever the end sought to be obtained might be best obtained thereby." And in the very next paragraph reference is made to literature of the association and of the federation— minutes, resolutions, reports, proclamations, printed discussions, etc.— from which the jury might draw conclusions as to what any man of ordinary intelligence would expect might be done by these bodies or by their agents whenever occasion for action might arise.

Counsel is also mistaken in assuming that the court "overlooked the significant fact that the American Federation of Labor had a constitution providing for boycotting." We did not overlook this fact, nor the further fact that the federation did not as a body declare any boycott against plaintiffs' firm. Since we did not indicate that there was error in admitting proof of the constitution of the federation, or of its action in conventions, or in committee or of its published literature, or of what it or its local branches did in connection with Berg, Roelofs or Loewe, or any one else, it might fairly be assumed that we considered that all these were proper matters for the consideration of the jury. We did intend to hold, however, and this petition has not modified our opinion, that plaintiffs cannot make out a case entitling them to the direction of a verdict in their favor by showing (1) that A. B. was a paying member of the United Hatters' Association; (2) that the Hatters' Association was affiliated with the American Federation of Labor and governed by its constitution, rules, and usages; (3) that the constitution of the federation contains the following: "It shall be the duty of executive council to secure the unification of all labor organizations so far as to assist each other in any justifiable boycott and with voluntary financial help in the event of a strike or lockout, when duly approved by the executive council." A boycott directed solely against the transfer of goods from a manufactory to purchasers or consignees within the same state might be a "justifiable boycott" so far as the anti-trust act is concerned, and this action can be maintained only for a violation of that statute; (4)

that on several occasions a person representing himself to be a missionary of the Hatters' Association called on dealers in other states who were importing Loewe's hats from Connecticut, and told them that unless they ceased doing so the missionary would call on their customers and endeavor to prevent their using their goods. What conclusion, touching each defendant, should be drawn from these facts in connection with the rest of the proof is a question for the jury to pass upon.

It may be well, however, that we should indicate for the guidance of the Circuit Court in the new trial that, as we understand the decision of the Supreme Court in this case, there may be a distinction drawn between (a) a combination to cause a strike in a manufactory located in a particular state, where the immediate object is the unionizing of that factory, although a part of its product, if manufactured, would have become the subject of interstate trade, and (b) a combination directly to restrain and put a stop to the importation by a person in one state of goods produced at a manufactory in another state, although the ultimate result sought to be obtained by such restraint might be merely the changing of conditions in that particular manufactory.

It is suggested in the petition for rehearing that "the question of entering judgment against part of the defendants was not considered in the opinion." It was not discussed in the opinion because it did not appear in the record or in plaintiffs' brief that it was contended that there should be any differentiation between the different defendants—all sued for a joint conspiracy. On the contrary, the whole argument was directed to the proposition that all were responsible for all the acts complained of. Nor is there even now any offer made to submit to a dismissal as to all except the very few who as plaintiffs express it "took active part in the conspiracy."

The petition for rehearing is denied.